WILLIAM M. STEVENS, Plaintiff-Appellant, v. ROOKS PITTS AND POUST, Defendant-Appellee.

First District (5th Division)   No. 1—96—2188

Opinion filed June 6, 1997.—Rehearing denied August 14, 1997.

William M. Stevens, of Chicago, for appellant *pro se.*

William J. Harte, Ltd., of Chicago (William J. Harte and Joan M. Mannix, of counsel), for appellee.

JUSTICE HOFFMAN delivered the opinion of the court:

The plaintiff, William M. Stevens, appeals from an order of summary judgment entered in favor of the defendant, Rooks Pitts and Poust (Rooks). A former partner at Rooks, Stevens alleges that certain termination provisions in the Rooks partnership agreement (Agreement) are in contravention of Rule 5.6 of the Illinois Rules of Professional Conduct (Code) (134 Ill. 2d R. 5.6) and are, therefore, unenforceable. We reverse and remand.

Stevens became a general partner at Rooks on January 1, 1981, and continued in that capacity until he voluntarily withdrew from the firm on May 31, 1992. Stevens was a signatory to the Agreement, which became effective January 1, 1984. Article ninth of the Agreement contains the following pertinent language concerning departure compensation to withdrawing partners:

> "In the event of the death of a General Partner, or the withdrawal of a General Partner by reason of (i) permanent disability, (ii) retirement, or (iii) voluntary or involuntary withdrawal of a General Partner pursuant to subparagraph (c) of ARTICLE FIRST hereof, the interest of the estate of any such deceased General Partner and the interest of any such withdrawing General Partner, (hereinafter in this Article called the 'Ex-Partner') shall be limited as follows:
>
> ***
>
> (b) The interest of the Ex-Partner in the tangible and intangible assets of the Partnership shall be limited to an amount equal to the net balance of the Ex-Partner's capital account, supplemental capital account, current account and any other account, on the dates of death or withdrawal, together with the Ex-Partner's share of collections, if any, received within three (3) years after death or withdrawal for work performed prior to January 1, 1984 in accordance with the income sharing percentages applicable to the year the work was performed ('Old Runoff'), plus the Ex-Partner's share of collections, if any, received within three (3) years after death or withdrawal for work performed after December 31, 1983 and before July 1, 1987 in accordance with the income sharing percentages in effect on June 30, 1987, ('New Runoff') and plus the Ex-

Partner's income sharing percentage at the time of death or withdrawal of the partnership's receivables and unbilled time for work performed after June 30, 1987 which is collected within three (3) years after such death or withdrawal ('Inventory'), which shall be paid as set forth below, subject to the adjustments, offsets and holdbacks set forth below. ***

\* \* \*

(iii) If the Ex-Partner has voluntarily or involuntarily withdrawn from the Partnership, the Ex-Partner shall be paid within a reasonable time after June 30 and December 31 in each year thereafter an amount equal to four-fifths (⁴/₅th) of his share of the collections of Old Runoff, New Runoff, and Inventory. *If the Ex-Partner is not directly or indirectly engaged in the practice of law, in competition to the legal practice of the Partnership existing immediately prior to his withdrawal either individually or in association with another law firm, in the Chicago metropolitan area including the City of Chicago and the seven (7) surrounding counties in Illinois and Indiana *** for a period of one (1) year subsequent to becoming an Ex-Partner, the Ex-Partner shall as soon as practicable thereafter receive an additional payment equal to one-fourth (¹/₄th) of the amount previously paid to the Ex-Partner hereunder and shall thereafter be paid all of his share of Old Runoff, New Runoff, and Inventory within a reasonable time after June 30 and December 31 of such year and each year thereafter.*" (Emphasis added.)

After Stevens' withdrawal, Rooks paid him $242,561.60, which constituted four-fifths of the compensation due to him under article ninth. Less than a year after he left Rooks, Stevens became associated with another Chicago law firm engaged in the general practice of law. Since Rooks deemed Stevens' practice to be competitive, it refused to pay him the remaining one-fifth of his departure compensation. According to Stevens, Rooks subtracted $60,640.40 from his total compensation of $303,202.00 in order to comply with article ninth.

On August 6, 1993, Stevens filed a complaint seeking a declaratory judgment that article ninth was in violation of Rule 5.6 (count I) and, alternatively, purporting to state a claim for breach of contract (count II). Stevens subsequently filed a motion for declaratory relief, apparently also intended as a summary judgment motion, alleging that Rooks' application of article ninth, as a matter of law, restricted Stevens' clients' choice of legal counsel in violation of Rule 5.6. Rooks also filed a motion requesting declaratory relief and summary judgment which asserted that article ninth did not violate Rule 5.6. On February 17, 1994, the trial court conducted a hearing and found

that article ninth constituted a financial disincentive but that a question of fact existed as to whether the 20% withheld from Stevens amounted to a restriction of his right to practice law. On August 18, 1995, Stevens filed a motion for reconsideration of this order. Rooks filed another motion for summary judgment.

On January 3, 1996, the trial court issued a memorandum opinion and order denying summary judgment to Stevens and granting summary judgment to Rooks. The court acknowledged that the majority of foreign cases analyzing financial disincentives in a law partnership or employment agreement hold that any agreement that causes a withdrawing attorney to forfeit revenues earned during active practice violates Rule 5.6, or its equivalent, since it restricts a lawyer's freedom of practice and unduly impairs a client's choice of attorney. However, the court distinguished these cases since they involved the "forfeiture of vested interests or earned revenues." The trial court found that the payment structure in the Agreement here did not include any forfeiture of funds "earned, due and owing." The court emphasized that the 80% collected by the withdrawing partner constituted gross sums from the "Old Runoff," "New Runoff," and "Inventory." In contrast, the remaining partners received percentages of net income. Accordingly, the court found that the actual impact on Stevens was considerably lessened since no adjustment was made for the firm's operating expenses incurred during the time the receivables were created.

The trial court commented that some of the foreign decisions finding forfeiture provisions unenforceable under Rule 5.6 had, nonetheless, recognized the legitimate right of a law firm to protect its own survival. The court held that subsection (b)(iii) of article ninth was merely a liquidated damages clause and found it to be a reasonable forecast of damages to Rooks. Based on that reasoning, the court granted summary judgment to Rooks, concluding that the Agreement struck a "balance between the interest of a going concern and the legal profession's obligation to allow a client's unfettered access to legal services."

The trial court's order also allowed Stevens to file an amended complaint. Stevens filed a second amended complaint on February 6, 1996, incorporating counts I and II of his original complaint and, further, purporting to state a breach of contract claim for $4,319 allegedly still due to Stevens from the 80% unadjusted share of his departure compensation (count III), and a breach of contract claim for the remaining $60,640 withheld from Stevens after his withdrawal (count IV). In a final order entered June 6, 1996, this complaint was dismissed with prejudice. Stevens appealed from both the January 3, 1996, and June 6, 1996, orders.

■ Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2—1005(c) (West 1994). The court must consider the affidavits, depositions, admissions, exhibits, and pleadings on file and construe the evidence strictly against the movant and liberally in favor of the nonmoving party. *In re Estate of Hoover*, 155 Ill. 2d 402, 410-11, 615 N.E.2d 736 (1993). This court reviews a summary judgment *de novo. Hoover*, 155 Ill. 2d at 411.

■ Stevens contends that the trial court erred in concluding that, as a matter of law, article ninth is not in contravention of the public policy underlying Rule 5.6(a) of the Code, which provides in pertinent part:

"A lawyer shall not participate in offering or making:

(a) a partnership or employment agreement that restricts the rights of a lawyer to practice after termination of the relationship, except an agreement concerning benefits upon retirement ***." 134 Ill. 2d R. 5.6(a).

Stevens argues that subsection (b)(iii) of article ninth restricts both a lawyer's right to practice law and the public's right to choose legal counsel. He maintains that a provision that requires ex-partners to choose between compensation or continued service to their clients discourages competition in that the disparate treatment of competing and noncompeting ex-partners deters the ex-partners from practicing law in the Chicago metropolitan area. This, in turn, infringes on the public's right to select the lawyer of their choice. Stevens notes that Rooks is a general practice law firm, which means that virtually any legal service he renders could be considered competition. Stevens' *per se* approach to this issue concludes that, whether subsection (b)(iii) is construed as a financial incentive or disincentive, the disparity in amounts payable to competing and noncompeting ex-partners contravenes Illinois public policy because it deters ex-partners from providing legal services to the public after leaving the firm.

Rooks counters that subsection (b)(iii) of article ninth does not purport to restrict an ex-partner's practice of law or the client's right to choose counsel; rather, it provides some modest measure of recoupment to Rooks for the economic harm caused by the departure and subsequent competition of one of its partners. Rooks acknowledges that an explicit post-withdrawal restrictive covenant in the Agreement would be facially invalid under Rule 5.6. Rooks also agrees that Rule 5.6 is intended to protect the public's right to choose a lawyer, but it advocates a "rule of reason" approach that attempts to achieve a balance between economic considerations associated with a law firm that loses valued partners and the policy of promoting client choice of counsel.

This case presents an issue of first impression in Illinois. Other states have considered forfeiture provisions in the context of rules substantially similar to our Rule 5.6. Noting that the objective of these rules is protecting counsel accessibility, courts have overwhelmingly refused to enforce provisions in partnership agreements that restrict the practice of law through financial disincentives to the withdrawing attorney. See, *e.g., Jacob v. Norris, McLaughlin & Marcus*, 128 N.J. 10, 607 A.2d 142 (1992) (court held that provision in the firm's termination agreement barring compensation to departing members of the firm if they rendered services to clients of the firm within one year of their termination date violated public policy); *Anderson v. Aspelmeier, Fisch, Power, Warner & Engberg*, 461 N.W.2d 598 (Iowa 1990) (law firm violated professional rules of conduct when it terminated payments for former partner's equity interest after he continued to serve firm clients); *Cohen v. Lord, Day & Lord*, 75 N.Y.2d 95, 550 N.E.2d 410, 551 N.Y.S.2d 157 (1989) (holding as a violation of DR 2—108 a provision of a partnership agreement conditioning payment of uncollected partnership revenues on withdrawing partner's noncompetition). As the court noted in *Jacob*:

> "Financial-disincentive provisions differ from direct restrictive covenants. They do not impose a blanket or geographical ban on the practice of law nor do they directly prohibit an attorney from representing former clients. By selectively withholding compensation, however, such provisions strongly discourage competitive activities.
>
> *** We believe that indirect restrictions on the practice of law, such as the financial disincentives at issue in this case, likewise violate both the language and the spirit of [Rule] 5.6." *Jacob*, 128 N.J. at 22, 607 A.2d at 148.

However, a few cases follow the "rule of reason" approach represented in *Howard v. Babcock*, 6 Cal. 4th 409, 863 P.2d 150, 25 Cal. Rptr. 2d 80 (1993). In *Howard*, the court held enforceable an agreement imposing a reasonable cost against an ex-partner who chooses to compete with his former firm in a limited area. The court concluded that such an agreement does not restrict the practice of law but, rather, attaches an economic consequence to a departing partner's unrestricted choice to pursue a particular kind of practice. Acknowledging "sweeping changes" in the practice of law and the fact that law firms have a financial interest in their clients, the court concluded that there was "no legal justification for treating partners in law firms differently in this respect from partners in other businesses and professions." *Howard*, 6 Cal. 4th at 421, 863 P.2d at 157, 25 Cal. Rptr. 2d at 87; see also *Haight, Brown & Bonesteel v. Superior*

*Court*, 234 Cal. App. 3d 963, 285 Cal. Rptr. 845 (1991); *Denburg v. Parker Chapin Flattau & Klimpl*, 82 N.Y.2d 375, 624 N.E.2d 995, 604 N.Y.S.2d 900 (1993).

Rule 5.6 of the Code, identical to its counterpart in the 1983 ABA Model Rules of Professional Conduct, was adopted by our supreme court on August 1, 1990. Prior to 1990, Illinois ethics rules were based on the 1969 ABA Model Code of Professional Responsibility. Illinois Disciplinary Rule 2—108 stated as follows:

> "In connection with the settlement of a controversy or suit, a lawyer shall not enter into an agreement which restricts his right to practice law." 107 Ill. 2d R. 2—108.

The Illinois rule omitted the following clause from DR 2—108 of the 1969 ABA Model Code:

> "A lawyer shall not be a party to or participate in a partnership or employment agreement with another lawyer that restricts the right of a lawyer to practice law after the termination of a relationship created by the agreement, except as a condition to payment of retirement benefits."

Whereas the ABA Model Code denounced partnership or employment agreements restricting post-association competition, our Rule 2—108 only prohibited the claimant's lawyer from offering, as an inducement for settlement, an assurance that he would not represent future claimants against the target of the suit.

In 1990, the supreme court promulgated the Illinois Code of Professional Conduct. The many changes included Rule 5.6, which prohibits lawyers from offering or making any employment contract that contains a provision restricting a lawyer's future practice. Although Rule 5.6 was enacted approximately six years after the Agreement was signed in 1984, the rule is applicable to preexisting contracts. *Dowd & Dowd, Ltd. v. Gleason*, 284 Ill. App. 3d 915, 932, 672 N.E.2d 854 (1996), *appeal allowed*, 171 Ill. 2d 564, 677 N.E.2d 964 (1997). In *Gleason*, this court noted that the supreme court has exclusive jurisdiction to regulate attorney conduct. The rules of professional conduct are, therefore, distinguishable from penal laws enacted by the legislative branch of government and are not governed by statutory prohibitions against *ex post facto* laws. *Gleason*, 284 Ill. App. 3d at 932. The court concluded that, "for public policy reasons, such as protecting the public's right to access to counsel, the supreme court intended that Rule 5.6 apply to all contracts existing at the time the rule went into effect." *Gleason*, 284 Ill. App. 3d at 932-33. Therefore, we must now determine whether the Agreement is in violation of the public policy underlying Rule 5.6.

■ Our courts apply a strict test in determining whether a

contract violates public policy; therefore, the courts will not declare a contract illegal unless it expressly contravenes the law or a known public policy of this state. *Schniederjon v. Krupa*, 130 Ill. App. 3d 656, 659, 474 N.E.2d 805 (1985). Moreover, Illinois public policy strongly favors freedom to contract. *Schniederjon*, 130 Ill. App. 3d at 659.

■ Although noncompetition agreements in general are carefully scrutinized by our courts because they can result in restraints of trade, an agreement containing reasonable time and territorial restraints will be enforced where the employee attempts to use for his own benefit confidential information about the employer's customers that he would not have acquired but for the employment relationship. *Williams & Montgomery, Ltd. v. Stellato*, 195 Ill. App. 3d 544, 553, 552 N.E.2d 1100 (1990). The employer is then said to have a "protectable business interest." *Williams*, 195 Ill. App. 3d at 553. The employer is also deemed to have a protectable interest in its customers or clients in those professions where the employer could anticipate a permanent or near-permanent relationship with the clientele. For example, Illinois courts have enforced noncompetition agreements among doctors (*Canfield v. Spear*, 44 Ill. 2d 49, 254 N.E.2d 423 (1969)), veterinarians (*Cockerill v. Wilson*, 51 Ill. 2d 179, 281 N.E.2d 648 (1972)), accountants and business consultants (*Rhoads v. Clifton, Gunderson & Co.*, 89 Ill. App. 3d 751, 411 N.E.2d 1380 (1980)), and insurance companies (*Tomei v. Tomei*, 235 Ill. App. 3d 166, 602 N.E.2d 23 (1992)).

However, while our courts have employed a reasonableness test as to noncompetition clauses for other professions, Illinois law provides little basis for allowing lawyer noncompetition clauses (see M. Lewis, *Today's Associate, Tomorrow's Competitor: New Rules Doom Noncompetition Agreements*, 79 Ill. B.J. 330, 332 (1991)), particularly since Rule 5.6 of the Code became effective. See, *e.g., Gleason*, 284 Ill. App. 3d at 932 (Rule 5.6 prohibited a provision in a law firm employment agreement requiring that, for two years after termination from the partnership, the lawyer would not solicit or entice away clients of the firm without the written consent of the firm); Ill. B.J. Advisory Op. No. 91—12 (1991) (found improper an employment contract requiring an attorney, in case of termination, to turn over to the firm any personal notes and reproductions relating to the business and to refrain for a period of three years following termination from soliciting clients that dealt with the firm during the term of his employment); Ill. State B. Ass'n Op. No. 93—13 (1994) (found professionally improper the employer's proposal that new attorney employees sign a promissory note for a three-year period payable only if the em-

ployee left his practice and either started his own practice or went to work for another attorney in a four-county area); *cf. Williams*, 195 Ill. App. 3d 544, 552 N.E.2d 1100; *Smith, Waters, Kuehn, Burnett & Hughes, Ltd. v. Burnett*, 192 Ill. App. 3d 693, 548 N.E.2d 1331 (1989) (pre-Rule 5.6 cases where the court evaluated the noncompete provisions for attorneys withdrawing from the firm under equitable principles without addressing ethical issues of such provisions); *Hicklin v. O'Brien*, 11 Ill. App. 2d 541, 138 N.E.2d 47 (1956) (court upheld a noncompetition covenant incident to the sale of a legal practice).

■ While we acknowledge the rationale behind the "rule of reason" cases, our research has revealed no Illinois case law that would support a finding that subsection (b)(iii) of article ninth is not violative of Rule 5.6. By requiring the departing lawyer to give up certain compensation due to him if he competes with the firm in a certain geographic area within one year after his departure, this financial disincentive provision hinders both the departing lawyer's ability to take on clients and the clients' choice of counsel. We conclude that subsection (b)(iii) of article ninth is in contravention to the public policy underlying Rule 5.6 and is unenforceable.

Where the parties to a contract against public policy are *in pari delicto*, a court generally will not aid either party but will leave both parties where it finds them. *O'Hara v. Ahlgren, Blumenfeld & Kempster*, 127 Ill. 2d 333, 348, 537 N.E.2d 730 (1989). This rule is intended to protect the public. *O'Hara*, 127 Ill. 2d at 348. Given that Stevens is a lawyer and a signatory to the Agreement executed and enforced by Rooks, his former law firm, we may assume that the parties possessed equal contractual positions and were *in pari delicto*. *Cf. O'Hara*, 127 Ill. 2d at 348. However, simply leaving these parties where we found them would eviscerate Rule 5.6 and its underlying public policy ensuring a client's choice of counsel. We will not leave the parties where they have placed themselves if it detrimentally affects the public. See *O'Hara*, 127 Ill. 2d at 349 (the interest of the public, rather than the equitable standing of the parties, is of determining importance).

We conclude that subsection (b)(iii) of article ninth may be severed and that the remainder of the Agreement may be enforced in Stevens' favor. As the court noted in *Corti v. Fleisher*, 93 Ill. App. 3d 517, 417 N.E.2d 764 (1981), "if the legal portion of a bilateral contract is severable, legal promises on one side being wholly supported by legal promises on the other, and the illegal portion of the contract does not go to its essence, the legal part may be enforced." 93 Ill. App. 3d at 533.

The *Jacob* court stated the following on this exact issue:

"That both the plaintiffs and defendants violated [Rule] 5.6 by signing the Agreement is true. Plaintiffs will get a 'windfall' by receiving compensation despite their violation. But if we barred plaintiffs from receiving compensation, [the partnership] would receive a 'windfall' by receiving the benefits of a covenant that is against public policy and unenforceable." *Jacob*, 128 N.J. at 35, 607 A.2d at 155.

Since the primary purpose of the Agreement was to provide compensation to departing members, the court there concluded that it could excise the illegal provision barring compensation and enforce the remainder of the contract. *Jacob*, 128 N.J. at 34, 607 A.2d at 155.

Article ninth concerns the interests of the general partners upon termination of the partnership or upon the death or withdrawal of a partner. Our review of this section indicates that subsection (b)(iii) may be severed since it does not go to the essence of article ninth and the general purpose of the termination provisions would not be compromised. The remaining portions of the Agreement are supported by legal promises from both Rooks and Stevens and, accordingly, may be enforced without subsection (b)(iii).

We note briefly Rooks' argument that Stevens waived the relief he is seeking or is estopped from his claim because he was a signatory to the Agreement and benefitted from the article ninth provisions when several partners withdrew before him. We reject Rooks' waiver argument. As a matter of the public policy underlying Rule 5.6, no law partnership agreement should restrict a departing partner's ability to practice law. Any application of waiver to the contrary would, therefore, be violative of public policy. See, *e.g., In re Marriage of Pagano*, 181 Ill. App. 3d 547, 567, 537 N.E.2d 398 (1989). Nor is Stevens estopped from bringing his claim. Since the primary concern with such agreements is the effect on the clients, application of estoppel principles under these circumstances is unwarranted. *Corti*, 93 Ill. App. 3d at 532.

We disagree with the trial court's conclusion that article ninth was merely a "liquidated damages clause proper in Illinois as the loss incurred by (Rooks) would be very difficult of accurate estimation and it appears to be a reasonable forecast of damages incurred." As a general rule, Illinois courts will not give effect to a liquidated damages provision if there exists a legislative directive to the contrary. See *Purolator Security, Inc. v. Wells Fargo Alarm Service*, 141 Ill. App. 3d 1106, 1112, 491 N.E.2d 161 (1986). Since it has been held that the Code operates with the force of law (see *In re Vrdolyak*, 137 Ill. 2d 407, 422, 560 N.E.2d 840 (1990)), subsection (b)(iii) would be unenforceable as a liquidated damages clause.

For the foregoing reasons, we reverse the order of the circuit court of Cook County granting summary judgment to Rooks. We remand this cause with instructions for the trial court to enter summary judgment in favor of Stevens and to compute the remaining departure compensation, prejudgment interest, and costs due to him.

Reversed and remanded.

HOURIHANE and SOUTH, JJ., concur.